Filed 7/20/15

<u>CERTIFIED</u> <u>FOR</u> <u>PARTIAL</u> <u>PUBLICATION</u>[*]


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

----


| | |
|---|---|
| THE PEOPLE,<br><br>          Plaintiff and Respondent,<br><br>     v.<br><br>JOSE RODOLFO RIVAS,<br><br>          Defendant and Appellant. | C072621<br><br>(Super. Ct. No. CRF 11-3020) |
| THE PEOPLE,<br><br>          Plaintiff and Respondent,<br><br>     v.<br><br>AARON ANTHONY VALADEZ,<br><br>          Defendant and Appellant. | C072621<br><br>(Super. Ct. Nos. CRF 11-3020,<br>CRF 09-3023 & CRF 09-<br>5199) |

---

[*]  Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of parts II through VIII.

APPEAL from a judgment of the Superior Court of Yolo County, Stephen L. Mock, Judge. Affirmed as to Defendant and Appellant Jose Rodolfo Rivas. Affirmed as modified as to Defendant and Appellant Aaron Anthony Valadez.

Law Office of Donald Masuda, Donald Masuda, and Kenny N. Giffard, Retained Counsel for Defendant and Appellant Jose Rodolfo Rivas.

Rebecca P. Jones, under appointment by the Court of Appeal, for Defendant and Appellant Aaron Anthony Valadez.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Christina Hitomi Simpson, Deputy Attorneys General, for Plaintiff and Respondent.

Defendants Jose Rodolfo Rivas and Aaron Anthony Valadez participated with other Norteño gang members in an attack on Osvaldo Hernandez and Victor Arechiga. Gang members stole beer that Arechiga had just purchased. After the beer had been taken, defendant Valadez trapped Hernandez in the driver's seat of Hernandez's car while defendant Rivas reached in from the passenger side and slashed Hernandez's face. Hernandez identified defendant Rivas as the one who slashed him, and defendant Valadez was identified as a participant in the attack by his palm print found on the driver's side window of Hernandez's car.

In the published part of the opinion, we find no merit in defendant Valadez's contention that the trial court committed prejudicial error by admitting fingerprint evidence even though, according to him, the scientific community has rejected the reliability of fingerprint evidence. In the unpublished part of the opinion, we conclude that two restitution fines must be vacated but in every other respect find no prejudicial error.

2

FACTS

Early in the morning on September 20, 2009, Osvaldo Hernandez drove his friend Victor Arechiga to a gas station with a convenience store to purchase beer. He parked near the front of the store, and Arechiga went in to make the purchase. Arechiga left the store with two 30-packs of beer and may have said something to a couple of girls as he passed by them.

As Arechiga put the beer in the backseat of Hernandez's car, a group of Norteño gang members rushed the car. One of the men yelled, "Are you a scrap?", using a disrespectful term for Sureños, and someone took the beer from the backseat. Meanwhile, the men began punching and kicking Hernandez as he sat in the driver's seat. Hernandez was not able to get out of the car because one of the men pushed against the driver's door. As Hernandez was being blocked from getting out of the car through the driver's door, someone entered the vehicle through the passenger side door and slashed Hernandez's cheek with a sharp object. It looked like his face was "split in half." After the slashing, the group of men fled.

Jennifer Hernandez, who is not related to Osvaldo Hernandez, was at the gas station when the attack took place. She saw a group of young men who were rambunctious and cocky, and she saw four or five men attacking the car that Hernandez was in.

Woodland Police Department detectives retrieved a surveillance video showing the attack at the gas station. In the video, which is grainy and pixelated, Arechiga is seen putting the beer in the backseat of the car, while Hernandez waits in the driver's seat. At least four men approach the car, chase off Arechiga, grab the beer from the backseat, punch and kick Hernandez, and flee. Specifically, a man is seen pushing the driver's door shut, with his hand on the driver's side window, to keep Hernandez in the car.

3

Another man is seen entering the front seat through the passenger's side and making a motion toward Hernandez with his right hand.

Based on a tip from an anonymous caller, the detectives contacted defendant Rivas's probation officer, Mike Ha, and had him watch the video to see if he could identify anyone. After watching the video several times, Probation Officer Ha was able to identify defendant Rivas and another man in the video.

Osvaldo Hernandez identified defendant Rivas at trial as the one who slashed his face. And Jennifer Hernandez identified defendant Rivas as one of the men gathered in the rowdy and rambunctious group at the gas station.

Two days after the attack on Hernandez, a community service officer with the Woodland Police Department identified six latent fingerprints on Hernandez's car, including a print from the outside of the driver's side window.

In May 2010, fingerprint analysts from the California Department of Justice identified a palm print taken from the outside of the driver's side window of Hernandez's car as matching a known palm print from defendant Valadez.

Defendants Rivas and Valadez are Norteño criminal street gang members.

Additional facts are included in our discussion of defendants' contentions.

PROCEDURE

In 2011, defendant Rivas and three other defendants were tried by jury for crimes committed during the attack on Hernandez. The jury convicted one defendant of battery with serious bodily injury, robbery, assault by means of force likely to produce great bodily injury, and participation in a criminal street gang, and the jury acquitted two defendants. However, as to defendant Rivas, the jury was unable to reach a verdict, and the court declared a mistrial.

In 2012, the prosecutor tried defendants Rivas and Valadez together. The jury convicted both defendants of aggravated mayhem (Pen. Code, § 205), assault by means of force likely to produce great bodily injury (Pen. Code, § 245, subd. (a)(1)), and active

4

participation in a criminal street gang (Pen. Code, § 186.22, subd. (a)). The jury found true allegations that defendant Rivas personally used a deadly weapon (Pen. Code, § 12022, subd. (b)(1)) and personally inflicted great bodily injury (Pen. Code, § 12022.7, subd. (a)) and that both defendants committed crimes on behalf of a criminal street gang (Pen. Code, § 186.22, subd. (b)(1)). The jury also convicted defendant Rivas of robbery, but it could not reach a verdict on the robbery count as to defendant Valadez.

The trial court sentenced defendant Rivas to state prison for an aggregate determinate term of 17 years and a consecutive indeterminate term of 15 years to life.

The trial court dismissed the robbery count against defendant Valadez and sentenced him to state prison for an aggregate determinate term of 10 years four months and a consecutive indeterminate term of seven years to life.

## DISCUSSION

### I

### *Fingerprint Evidence*

### (Valadez only)

Defendant Valadez contends the trial court committed prejudicial error when it admitted fingerprint evidence connecting him to the crimes because the scientific community has rejected the reliability of fingerprint evidence. The fingerprint evidence in this case was essential to the prosecution's case because the only two circumstances that connected defendant Valadez to the crimes were his membership in the same gang as the other assailants and the presence of his palm print on the victim's car. Specifically, defendant Valadez argues that (1) fingerprint identification has not been shown to be reliable and (2) there was no adequate foundation for the expert testimony given in this case that the latent print on the car was from defendant Valadez's palm. The contention is without merit because (1) fingerprint evidence is not so unreliable that it must be excluded and (2) the foundation laid for the fingerprint evidence in this case was sufficient.

5

A.    *Procedural Background*

Defendant Valadez filed a motion in limine to exclude fingerprint evidence at trial. He claimed that "[1] latent fingerprint identification evidence is subject to *Kelly*[1] admissibility requirements, [2] fingerprint identification evidence is no longer generally accepted in the scientific community, [and 3] there is no generally accepted statement that can be made regarding the significance of a match between a latent fingerprint and a known print. . . ."  In support of defendant Valadez's motion, he reviewed the history of fingerprint evidence in California courts and asserted that "[t]he unproven assumption that the fingerprint process is reliable can no longer be sustained."  Defendant Valadez argued that fingerprint evidence is suspect because (1) there is no scientific research showing that no two individuals' fingerprints have the same ridge characteristics, which are the primary characteristics used to identify a person's fingerprint, and (2) there has been no proof that a fingerprint analyst can reliably identify a person by comparing a known fingerprint sample to a fingerprint that is subject to an "unknown degree of distortion and variability . . . ."  Defendant Valadez also claimed that fingerprint evidence is unreliable because there has been no testing done in determining the reliability of fingerprint analysis, including development of statistical data and uniform standards.

Defense counsel told the court that the motion was based, "most fundamental[ly]," on the argument that "scientific evaluation of fingerprint evidence" was "undergoing radical changes."  The trial court refused to hold an evidentiary hearing on fingerprint evidence.  It noted that there is no requirement to hold a *Kelly* hearing because fingerprint analysis is not a novel scientific technique.  The court said that if the fingerprint analyst was successfully qualified as an expert, the court would allow her to offer an opinion

---

**1**    *People v. Kelly* (1976) 17 Cal.3d 24 (*Kelly*).

6

concerning whether defendant Valadez's palm print matched the one taken from the car and defense counsel could cross-examine on the foundation for that opinion.

At trial, the prosecution called Norma Vidales, a community services officer for the Woodland Police Department, to testify concerning fingerprint evidence that she collected. She had been doing crime scene investigations for eight years, including photography, fingerprinting, sketching, and other evidence collection. She described how a fingerprint is processed from a crime scene and sent to the Department of Justice for analysis.

On September 22, 2009, two days after the assault on Hernandez, Vidales was sent to collect evidence from Hernandez's car. She took pictures of the car and lifted six fingerprints, one of which, People's exhibit No. 4, was from the exterior of the driver's side window.

The prosecution also called Elizabeth Troxel, an employee of the California Department of Justice, to testify as an expert on latent fingerprint analysis. Before the court qualified her as an expert, both the prosecutor and counsel for defendant Valadez questioned her concerning her training and experience. She had worked for the Department of Justice for four years and, before that, for the Sacramento Police Department for 14 years. She completed various courses on crime scene investigation, including basic and advanced latent fingerprint comparisons. She has never done scholarly research on fingerprint analysis, but has read published studies on the subject. Her proficiency in properly comparing fingerprints is regularly tested. She is certified as a fingerprint analyst by the International Association for Identification. And she has done fingerprint comparisons "thousands or tens of thousands of times."

Defendant Valadez objected to her qualification as an expert in fingerprint analysis, but the trial court overruled the objection and allowed Troxel to give expert opinion testimony on latent fingerprint analysis.

7

In Troxel's experience, she has never seen two people have the same fingerprint or palm print.

Over an objection by defendant Valadez concerning the foundation for Troxel's knowledge, Troxel also testified that fingerprints are formed before birth and, except for growth, do not change. No two persons have ever been found to have the same fingerprint. Each is unique, based on the pattern and characteristics of the ridges in the fingerprint.

Troxel described the process used to identify an individual from a fingerprint. The method, identified in cases using the acronym ACE-V, includes analysis, comparison, evaluation, and verification. (*In re O.D.* (2013) 221 Cal.App.4th 1001, 1004 (*O.D.*).) She testified that a print collected by an agency and sent to the Department of Justice is analyzed and scanned so that it can be digitally compared to fingerprints already in the computer system, which is known as the Automated Latent Print System (ALPS). ALPS identifies possible matches, which the analyst then compares to the fingerprint taken from the crime scene to determine whether there is a match.

In this case, Troxel was not the original fingerprint analyst who compared the print taken from the exterior driver's side window (exhibit No. 4) with the print suggested by ALPS, which is a known palm print from defendant Valadez. Instead, she verified the work of another fingerprint analyst. She compared exhibit No. 4 with the known palm print of defendant Valadez and concluded, as had the other analyst, that they matched based on the characteristics of the prints. The print taken from the car and the known palm print of defendant Valadez had 32 characteristics in common, or four times the minimum standard for identifying a match. That standard, as set by the Department of Justice, is eight characteristics in common.

Counsel for defendant Valadez questioned Troxel on what she knew about mistakes that may have been made in fingerprint identification in other jurisdictions. She was aware mistakes had been made, but very few.

8

In defendant Valadez's opening brief on appeal, he claims his trial counsel "tried to get Troxel to explain what she did to determine that Exhibit 4 was made by Mr. Valadez, but [Troxel] refused to say much more than that she had compared the prints." We disagree with defendant Valadez's characterization of the testimony. Counsel asked Troxel to hold up the two cards (exhibit No. 4 and the known palm print of defendant Valadez) for the jury to see. And counsel then asked Troxel to show the jury "where the match is." This simplistic question predictably elicited a bewildered response, "Where the match is?" Troxel noted that it would be impossible for the jury to see the characteristics of the prints on the cards because the cards were small and the jury was far away. She suggested, however, that the jury would be able to see the characteristics of the prints if they passed the cards around. There was no evasiveness or refusal in Troxel's answers.

B.    *Law and Analysis*

1.    Reliability of Fingerprint Evidence

We approach defendant Valadez's contention that fingerprint evidence must be excluded as unreliable with two separate, but complementary, lines of reasoning. First, we conclude, as did Division Four of the First Appellate District in *O.D.* (Humes, J.), that expert fingerprint evidence is not subject to a foundational hearing under *Kelly, supra,* 17 Cal.3d 24, because fingerprint evidence is not a novel scientific technique and does not have a misleading aura of certainty. And second, we conclude, as did the Seventh Circuit Court of Appeals (Posner, J.) in *United States v. Herrera* (7th Cir. 2013) 704 F.3d 480 (*Herrera*), that fingerprint evidence, in general, is not so unreliable that it must be excluded.

In *O.D.*, the minor claimed fingerprint evidence should have been excluded under *Kelly* "because there was no longer 'general acceptance' of fingerprint comparison 'in the relevant scientific community.' ([*Kelly, supra,* 17 Cal.3d] at p. 30.)" (*O.D., supra,* 221 Cal.App.4th at p. 1004.) In support, the minor submitted a report of the National

9

Academy of Sciences questioning the reliability of identification through fingerprint comparisons. The trial court took the motion to exclude the evidence under advisement, and the expert testified concerning the method of analysis, as well as the application of that analysis to the fingerprint evidence in question. (*Ibid*.) The expert "acknowledged that fingerprint comparison is 'subjective,' that there is no established error rate, and that no studies suggest that the process is infallible." (*Id*. at p. 1005.) At the close of evidence, the court denied the motion to exclude the fingerprint evidence and relied on it to find the minor had committed the alleged burglary. (*Ibid*.)

On appeal, the minor renewed the contention that the fingerprint evidence should have been excluded. In rejecting the contention, the *O.D.* court reviewed *Kelly* and its progeny and the admissibility of fingerprint evidence.

"In *Kelly*, the California Supreme Court adopted the rule of *Frye v. U.S.* (D.C. Cir. 1923) 54 App.D.C. 46 [293 F. 1013] (*Frye*) governing the admissibility of expert testimony that relies on 'a new scientific technique.' (*Kelly, supra,* 17 Cal.3d at p. 30.) When a party seeks to introduce evidence relying on a new scientific technique, *Kelly* requires the party to show 'general acceptance of the new technique in the relevant scientific community' as well as the witness's qualification as an expert and use of '[the] correct scientific procedures' in employing the technique. (*Kelly*, at p. 30.)" (*O.D., supra,* 221 Cal.App.4th at p. 1006, fn. omitted.)

"The primary purpose of the *Kelly* rule is 'to protect the jury from techniques which, though "new," novel, or "experimental," convey a " 'misleading aura of certainty.' " ' [Citation.] This danger arises when techniques 'seem scientific and infallible, but . . . actually are not.' [Citation.] The *Kelly* rule 'is intended to forestall the jury's uncritical acceptance of scientific evidence or technology that is so foreign to everyday experience as to be unusually difficult for laypersons to evaluate.' [Citation.] 'Because the inventions and discoveries which could be considered "scientific" have become virtually limitless,' the determination whether expert testimony relies on a

' "scientific technique" ' is made in light of this 'narrow "common sense" purpose' of protecting the trier of fact from techniques that misleadingly convey certainty. [Citation.] The *Kelly* rule is frequently inapplicable to expert testimony because the testimony is often neither based on a new scientific technique nor likely to convey an aura of certainty. '[A]bsent some special feature which effectively blindsides the jury, expert opinion testimony is not subject to *Kelly*[].' [Citation.]" (*O.D., supra,* 221 Cal.App.4th at pp. 1006-1007.)

In *O.D.*, the fingerprint analysts used the ACE-V method (analysis, comparison, evaluation, verification). (*O.D., supra,* 221 Cal.App.4th at p. 1004.) The *O.D.* court found that "the *Kelly* rule is inapplicable to the ACE-V method of fingerprint comparison because, regardless whether it is generally accepted, fingerprint comparison is not the type of scientific technique *Kelly* governs since it can easily be understood by nonexperts and is unlikely to convey a misleading aura of certainty. [Citation.]" (*Id*. at p. 1007.) "Our Supreme Court, in [*People v.*] *Venegas* [(1998) 18 Cal.4th 47], expressly distinguished DNA evidence, which is subject to *Kelly*, from '*fingerprint*, shoe track, bite mark, or ballistic comparisons, which [laypersons] essentially can see for themselves.' (*People v. Venegas*, *supra,* 18 Cal.4th at pp. 80-81, italics added.)" (*O.D., supra,* at p. 1007.)

In *O.D.*, the fingerprint expert "testified that the process of comparing prints is a 'visual' one, and the juvenile court was able to see the palm prints being compared and observe their similarities. In addition, there was no suggestion that the prints were tampered with or altered. [Citations.]" (*O.D., supra,* 221 Cal.App.4th at p. 1007.)

Finally, the *O.D.* court wrote: "[The fingerprint expert's] testimony was particularly unlikely to convey a misleading aura of certainty because [she] openly acknowledged that fingerprint comparisons are inherently subjective and that no study establishes their infallibility. She also made clear that it was her opinion – not an established scientific fact – that the palm print [at the crime scene] matched [the minor's].

11

'When a witness gives [her] personal opinion on the stand – even if [she] qualifies as an expert – [laypersons] may temper their acceptance of [her] testimony with a healthy skepticism born of their knowledge that all human beings are fallible.' [Citation.]" (*O.D., supra,* 221 Cal.App.4th at p. 1007.)

Based on this analysis, the *O.D.* court held that fingerprint evidence is admissible without a foundational hearing because "the comparison of fingerprints is not the type of 'scientific technique' that *Kelly* governs. [Citation.]" (*O.D., supra,* 221 Cal.App.4th at pp. 1007-1008.)

Citing the same National Academy of Sciences report as was cited by the minor in *O.D.*, as well as other related reports, to try to discredit fingerprint evidence, defendant Valadez claims that the present method of using latent fingerprints to identify perpetrators of crimes has not been shown to be reliable. In making this claim, defendant Valadez provides an essay on fingerprint analysis, citing the various reports which he maintains call into doubt the reliability of fingerprint analysis.

This approach is unavailing. As the *O.D.* court noted, fingerprint evidence is not subject to exclusion based on a challenge to its reliability because it is not a new scientific technique and it does not convey a misleading aura of certainty. (*O.D., supra,* 221 Cal.App.4th at pp. 1006-1007.) As the Supreme Court has held, the jury can observe the fingerprints and make its own comparison to determine for itself the similarities. (*Id.* at p. 1007; *People v. Venegas, supra,* 18 Cal.4th at pp. 80-81.)

A defendant may respond to fingerprint evidence by challenging the training of the fingerprint expert (which defendant Valadez did in this case), by challenging the process by which the fingerprint expert made the comparison (which defendant Valadez did in this case to some extent), or by showing that the fingerprints do not match, either by calling the defense's own expert or simply showing the jury where they do not match (which defendant Valadez apparently did not do here).

12

In his briefing on appeal, defendant Valadez avoids discussion of *Kelly*; instead, he asserts, generally, that fingerprint evidence is so unreliable that it does not meet the threshold of admissibility.  (See *Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 769-772 [trial courts play vital gatekeeping role to insure reliability of underlying conceptual or methodological basis of expert testimony].)  We conclude that fingerprint evidence is sufficiently reliable to be admissible, as was found by the Seventh Circuit Court of Appeals in *Herrera*.  We quote the *Herrera* decision at length in this regard because we find it persuasive:

"The . . . issue relating to the fingerprint evidence is whether [the fingerprints found on the evidence] were the defendant's.  They were latent rather than patent fingerprints.  Patent fingerprints are made by pressing a fingertip covered with ink on a white card or similar white surface, and are visible.[2]  Latent fingerprints are prints, usually invisible, left on a smooth surface when a person touches it with a finger or fingers.  Laboratory techniques are employed to make a latent fingerprint visible so that it can be compared with other fingerprints.  The latent prints on the [evidence] in this case were found by a fingerprint examiner to match the defendant's patent prints made in the course of the criminal investigation, and the government therefore offered the match as evidence of the defendant's participation in the [crimes].  The defendant argues that methods of matching latent prints with other latent prints or with patent prints have not been shown to be reliable enough to be admissible as evidence under the standard for reliability set forth in [federal rules and decisions]."  (*Herrera, supra,* 704 F.3d at pp. 483-484.)

"The [ACE-V] methodology requires recognizing and categorizing scores of distinctive features in the prints [citation], and it is the distinctiveness of these features,

---

**2**     We recognize that other modern means of collecting a person's fingerprints are also used, such as digital scanning.

13

rather than the ACE-V method itself, that enables expert fingerprint examiners to match fingerprints with a high degree of confidence. That's not to say that fingerprint matching (especially when it involves latent fingerprints, as in this case) is as reliable as DNA evidence, for example. Forensic DNA analysis involves comparing a strand of DNA (the genetic code) from the suspect with a strand of DNA found at the crime scene. The comparison is done with scientific instruments and determines whether the segments are chemically identical. Errors are vanishingly rare provided that the strands of code are reasonably intact." (*Herrera, supra,* 704 F.3d at p. 485.)

"Chemical [DNA] tests can determine whether two alleles are identical, but a fingerprint analyst must visually recognize and classify the relevant details in the latent print – which is difficult if the print is incomplete or smudged. '[T]he assessment of latent prints from crime scenes is based largely on human interpretation. . . . [T]he process does not allow one to stipulate specific measurements in advance, as is done for a DNA analysis. Moreover, a small stretching of distance between two fingerprint features, or a twisting of angles, can result from either a difference between the fingers that left the prints or from distortions from the impression process.' [Citation.]

"Matching latent fingerprints is thus a bit like an opinion offered by an art expert asked whether an unsigned painting was painted by the known painter of another painting; he makes or rejects a match on the basis of visual evidence. Eyewitness evidence is similar. The eyewitness saw the perpetrator of a crime. His recollection of the perpetrator's appearance is analogous to a latent fingerprint. He sees the defendant at the trial – that sighting is analogous to a patent fingerprint. He is asked to match his recollection against the courtroom sighting – and he is allowed to testify that the defendant is the perpetrator, not just that there is a close resemblance. A lineup, whether photo or in-person, is a related method of adducing matching evidence, as is handwriting evidence.

14

"Matching evidence of the kinds that we've just described, including fingerprint evidence, is less rigorous than the kind of scientific matching involved in DNA evidence; eyewitness evidence is not scientific at all. But no one thinks that only scientific evidence may be used to convict or acquit a defendant. The increasingly well documented fallibility of eyewitness testimony, [citation], has not banished it from criminal trials. [Citation.]

"Evidence doesn't have to be infallible to be probative. Probability of guilt is a function of all the evidence in a case, and if items of evidence are independent of one another in the sense that the truth of any one item is not influenced by the truth of any other, the probability of guilt may be much higher if there is evidence from many independent sources (several eyewitnesses, an eyewitness plus fingerprints, etc.) than it would be were there only the evidence of one eyewitness, say." (*Herrera, supra,* 704 F.3d at pp. 485-486, italics omitted.)

"Fingerprint experts such as the government's witness in [*Herrera*] – who has been certified as a latent print examiner by the International Association for Identification, the foremost international fingerprint organization (there are only about 840 IAI-certified latent examiners in the world, out of 15,000 total examiners) – receive extensive training; and errors in fingerprint matching by expert examiners appear to be very rare. Of the first 194 prisoners in the United States exonerated by DNA evidence, none had been convicted on the basis of erroneous fingerprint matches, whereas 75 percent had been convicted on the basis of mistaken eyewitness identification. [Citation.] The probability of two people in the world having identical fingerprints is not known, but it appears to be extremely low. [Citations.] The great statistician Francis Galton estimated the probability as 1 in 64 billion. [Citation.] That was not an estimate of the probability of a mistaken matching of a latent to a patent or another latent fingerprint. Yet errors in such matching appear to be very rare, though the matching process is judgmental rather than scientifically rigorous because it depends on how readable the

15

latent fingerprint is and also on how distorted a version of the person's patent fingerprint it is. Examiners' training includes instruction on how to determine whether a latent print contains enough detail to enable a reliable matching to another print. Ultimately the matching depends on 'subjective judgments by the examiner,' [citation], but responsible fingerprint matching is admissible evidence, in general and in this case." (*Herrera, supra,* 704 F.3d at pp. 486-487.)

The evidence is in this case is similar to the evidence in *Herrera*. A print was collected from the victim's car, and a fingerprint analyst certified by the International Association for Identification determined that the collected print matched the known palm print of defendant Valadez. Based on the analysis from *Herrera*, we conclude that fingerprint evidence, in general, is sufficiently reliable to be admitted.

### 2. Foundation for Expert Testimony in this Case

Defendant Valadez contends that, even if the trial court did not abuse its discretion by not holding a hearing to determine whether fingerprint evidence is reliable, it abused its discretion by overruling defendant Valadez's objections, based on lack of foundation, to Troxel's testimony. He claims that she failed to establish any reasonable foundation for her opinion. We disagree, based largely on the discussion above.

Defendant Valadez's argument in this regard is as follows:

"[T]he prosecution and Troxel failed to establish the foundation for Troxel's opinion that the latent palm print matched Mr. Valadez's palm print. Before she declared the prints a match she said virtually nothing about the basis for her finding, and afterward, even when pushed, she offered only generic testimony about looking at the prints side by side and noting generally similar characteristics between the two."

This argument is without merit. As discussed in the authorities reviewed above, fingerprint evidence involves no more than comparing latent prints (those found at the crime scene) with patent prints (previously collected). Troxel explained that she compared the characteristics of the prints and found that they matched. Because

16

(1) fingerprint evidence, generally, is not so unreliable as to be inadmissible and (2) Troxel, a trained fingerprint analyst, explained the process she used in comparing the fingerprints and reaching her conclusion, the trial court did not abuse its discretion in overruling defendant Valadez's foundational objections. (See *People v. Smith* (2005) 35 Cal.4th 334, 357-358 [no abuse of discretion to admit relevant expert testimony for which foundation laid].) As the trial court told counsel, defendant Valadez could attempt to impeach Troxel by questioning her about her qualifications and the comparison of these prints or by introducing testimony of a defense expert, but Troxel's testimony was nonetheless admissible.

II

*Instruction Concerning Aiding and Abetting*

(Valadez only)

Defendant Valadez contends that the trial court erred by not instructing the jury, sua sponte, that it could find him guilty, under the natural and probable consequences theory, of a lesser crime than the crime committed by the direct perpetrator. We conclude defendant Valadez forfeited this contention by failing to request an instruction in the trial court.

"It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence. [Citations.] The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case. [Citations.]" (*People v. St. Martin* (1970) 1 Cal.3d 524, 531.) However, " ' "[a] party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language." ' [Citations.]" (*People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1163 (*Samaniego*).)

17

A person who knowingly aids and abets criminal conduct is guilty of not only the target offense, but also of any other crime the perpetrator actually commits that is the natural and probable consequence of the target offense. (*People v. Medina* (2009) 46 Cal.4th 913, 920.) A nontarget offense is a natural and probable consequence of the target offense if, judged objectively, the nontarget offense was reasonably foreseeable. This judgment does not rely on whether the aider and abettor actually foresaw the nontarget offense. Instead, liability is determined by whether a reasonable person in the defendant's position would have or should have known that the charged offense was a reasonably foreseeable consequence of the act aided and abetted. The jury determines whether such reasonable foreseeability exists based on the facts before it. (*Ibid*.)

Here, the trial court instructed the jury on direct aiding and abetting liability, using CALCRIM Nos. 400 and 401, including the element of intending to aid and abet the specific crime committed.

The court also instructed the jury on the natural and probable consequences theory of aiding and abetting, using CALCRIM No. 402: "A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes. . . ."

The court explained how the natural and probable consequences theory related to the aggravated mayhem charge. The instruction included the following statement: "The People allege that the defendants originally intended to aid and abet the commission of either robbery or assault by means likely to produce great bodily injury. The defendant is guilty of aggravated mayhem if the People have proved that a defendant aided and abetted either robbery or assault by means likely to produce great bodily injury and that aggravated mayhem was the natural and probable consequence of either robbery or assault by means likely to produce great bodily injury."

After giving the instructions on the aiding and abetting theories, the court instructed the jury on the elements of aggravated mayhem, as charged in count 1. And

18

the court instructed the jury that "[i]f all of you find that a defendant is not guilty of a greater charged crime, you may find him guilty of a lesser crime if you are convinced beyond a reasonable doubt that the defendant is guilty of that lesser crime." In the same instruction, the court told the jury, "Mayhem is a lesser crime of Aggravated Mayhem charged in Count 1." Finally, the court instructed the jury on the elements of simple mayhem.

On appeal, defendant Valadez contends that the trial court erred because it did not inform the jurors that an aider and abettor can be found guilty of a lesser included offense (here, simple mayhem) even if the direct perpetrator is found guilty of the greater offense (here, aggravated mayhem). While defendant Valadez is correct that the law allows this circumstance, the trial court did not have a duty, sua sponte, to give an instruction specifically to that effect.

"[I]n determining aider and abettor liability [under the natural and probable consequences theory] for crimes of the perpetrator beyond the act originally contemplated, the jury must be permitted to consider uncharged, necessarily included offenses where the facts would support a determination that the greater crime was not a reasonably foreseeable consequence but the lesser offense was such a consequence. Otherwise, . . . the jury would be given an unwarranted, all-or-nothing choice for aider and abettor liability. [Citation.]" (*People v. Woods* (1992) 8 Cal.App.4th 1570, 1588.)

As given, the instructions in this case were correct and sufficient. They educated the jury on the natural and probable consequences theory, and they informed the jury that, if the jury did not find the defendant guilty of the greater offense, it could consider lesser offenses. The instructions identified simple mayhem as a lesser offense of aggravated mayhem. Applying logic to the instructions, as we must presume the jury did (*People v. Lewis* (2001) 26 Cal.4th 334, 390 [jurors are presumed to be intelligent, capable of understanding instructions and applying them to the facts of the case]), a juror would know from the instructions that, if aggravated mayhem was not the natural and probable

19

of consequence of the assault or robbery committed, then simple mayhem could be considered as the natural and probable consequence of the assault or robbery.

We note here that the instructions given to the jury concerning aiding and abetting did not include the "equally guilty" language criticized by defendants in other cases. (See *Samaniego, supra,* 172 Cal.App.4th at pp. 1162-1163.)

We will not presume that, because the jury found defendant Rivas guilty of aggravated mayhem, it believed that it had to find defendant Valadez either guilty of aggravated mayhem or not guilty of any mayhem offense. In fact, the court instructed the jury to determine the guilt of each defendant separately: "You must separately consider the evidence as it applies to each defendant. You must decide each charge for each defendant separately." Therefore, there was no error in the instructions.

Defendant Valadez may not complain on appeal that these instructions, which were correct in law and responsive to the evidence, were too general or incomplete because he did not request appropriate clarifying or amplifying language. (*Samaniego, supra,* 172 Cal.App.4th at p. 1163.)

III

*Sufficiency of Evidence*

(Valadez only)

Defendant Valadez contends the evidence was insufficient to convict him on any of the charges. He claims that, as to all of the charges, the evidence was insufficient to establish that he was present at the scene of the crimes, and, as to the aggravated mayhem count, the evidence was insufficient that he aided and abetted the crime. We conclude that the evidence supports the convictions.

A.  *Legal Background*

" 'In reviewing the sufficiency of evidence under the due process clause of the Fourteenth Amendment to the United States Constitution, the question we ask is "whether, after viewing the evidence in the light most favorable to the prosecution, any

20

rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." ' [Citation.] We apply an identical standard under the California Constitution. [Citation.] 'In determining whether a reasonable trier of fact could have found defendant guilty beyond a reasonable doubt, the appellate court "must view the evidence in a light most favorable to respondent and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." ' [Citation.]" (*People v. Young* (2005) 34 Cal.4th 1149, 1175, italics omitted.) In reviewing the sufficiency of the evidence, "a reviewing court resolves neither credibility issues nor evidentiary conflicts. [Citation.] Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact. [Citation.]" (*Id.* at p. 1181.) We will reverse for insufficient evidence only if " ' " 'upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' [Citation.]" ' " (*People v. Manriquez* (2005) 37 Cal.4th 547, 577.)

      B.    *Analysis*

          1.    Presence at the Scene

Defendant Valadez's palm print on the victim's car, along with the common gang affiliation with the other assailants, was sufficient to establish that he was present at the scene. His main two criticisms of the evidence in this regard are that (1) gang affiliation is not sufficient to establish presence and (2) the palm print evidence lacked a foundation. We need not determine whether gang affiliation, alone, was sufficient to place defendant Valadez at the scene of the crimes because it was not the only evidence. The more convincing evidence of his presence was the palm print on the car. Certainly, his palm print on the car, combined with his gang affiliation with the other assailants, was sufficient to establish he was present at the scene. Therefore, defendant Valadez's argument that the evidence was insufficient to convict of any of the crimes is without merit because it was sufficient to place him at the scene of the crimes.

## 2.     Aiding and Abetting Aggravated Mayhem

The evidence was also sufficient to establish that defendant Valadez directly aided and abetted defendant Rivas in committing aggravated mayhem. We therefore need not consider whether the evidence was also sufficient to establish that aggravated mayhem was the natural and probable consequence of the assault or robbery.

To establish that defendant Valadez directly aided and abetted defendant Rivas in committing aggravated mayhem, the prosecution had to prove beyond a reasonable doubt that (1) defendant Rivas committed the crime of aggravated mayhem, (2) defendant Valadez knew that defendant Rivas intended to commit the crime; (3) before or during the commission of the crime, defendant Valadez intended to aid and abet defendant Rivas in committing the crime; and (4) defendant Valadez's words or conduct did in fact aid and abet defendant Rivas's commission of the crime. (CALCRIM No. 401.)

Considering all of the evidence, the jury could reasonably infer that defendant Valadez held Hernandez's car door shut while defendant Rivas entered through the passenger door and cut Hernandez's face, even if no witness could identify defendant Valadez from the surveillance video. His palm print was found on the outside of the driver's side window, right where one would expect to find it if he held the door shut. Combined with the video showing someone holding the door shut with his palm against the upper part of the closed window, the recovered palm print supports the inference that defendant Valadez was the one doing it. In addition to this inference, the jury could also reasonably infer that defendant Valadez was holding the door shut and trapping Hernandez inside to permit defendant Rivas to have access to Hernandez and cut him. Finally, a prosecution expert testified that the coordinated slashing by which defendant Rivas injured Hernandez was typical of how a gang might injure its victim. Even the defense expert agreed gangs used coordinated slashings to scar their victims and scare others, although he did not know it was done outside prisons. The jury could infer that

22

defendant Valadez's actions aided and abetted aggravated mayhem because defendant Rivas's method of slashing Hernandez was indicative of how gangs mark their victims.

Therefore, there is sufficient evidence of all of the elements of aiding and abetting: (1) defendant Rivas committed aggravated mayhem; (2) defendant Valadez knew defendant Rivas intended to commit the crime, as can reasonably be inferred from his presence at the scene with defendant Rivas, his common gang membership, and his trapping the victim in the car while defendant Rivas slashed the victim; (3) defendant Valadez intended to aid and abet defendant Rivas as shown by the same actions; and (4) defendant Valadez's actually aided and abetted the crime by trapping Hernandez in the car to give defendant Rivas access to him to commit aggravated mayhem.

IV

*Sufficiency of Evidence*

(Rivas only)

Relying on asserted uncertainties and contradictions in the evidence and construing the evidence in a way to favor him, defendant Rivas contends that the evidence was insufficient to convict him of aggravated mayhem because it showed an opportunistic wounding of Hernandez rather than a focused slicing of the face with specific intent. However, construing the evidence properly on appeal, we conclude it established an intentional and permanent disfigurement of Hernandez.

A Woodland Police Department detective testified as an expert on criminal street gangs. He gave his opinion that attacks like the one committed here are for the benefit of the criminal street gang. He also explained that the injury inflicted on Hernandez, leaving an obvious scar, was done as an "advertisement" for the Norteños.

Defendant Rivas also introduced testimony of a gang expert. He testified that the type of wound inflicted on Hernandez is referred to as a "bitch slash" in prison. He was aware of it being done to inmates who were pinned down by other inmates, but he had never seen it outside the prison setting.

23

The trial court instructed the jury on the elements of aggravated mayhem:

"To prove that the defendant is guilty of [aggravated mayhem (Pen. Code, § 205)], the People must prove that:

"1.     The defendant unlawfully and maliciously disabled or disfigured someone permanently;

"2.     When the defendant acted, he intended to permanently disable or disfigure the other person

"AND

"3.     Under the circumstances, the defendant's act showed extreme indifference to the physical or psychological well-being of the other person."  (CALCRIM No. 800.)

In making his argument that the evidence was not sufficient to establish aggravated mayhem, defendant Rivas relies heavily on *People v. Lee* (1990) 220 Cal.App.3d 320, 325, which held:

"[E]vidence which shows no more than an ' "indiscriminate attack" ' on the body of the victim is insufficient to prove the specific intent to commit mayhem under [Penal Code] section 203 [the simple mayhem statute].  In addition, that specific intent cannot be inferred solely from evidence that the injury inflicted constitutes mayhem; instead, there must be other facts and circumstances which give rise to an inference of intent to maim rather than attack indiscriminately.  (*People v. Ferrell* [(1990)] 218 Cal.App.3d [828,] 835.)"  (*People v. Lee, supra,* 220 Cal.App.3d at p. 325.)

Defendant Rivas claims this was nothing more than an indiscriminate attack because (1) his expert testified that "bitch slash" attacks are unlikely to occur on the streets, (2) such attacks are committed while other gang members restrain the victim, and (3) this was merely a "swarming, rat-pack assault, with some gang members kicking and punching from one side, while another attacked with a knife from the other . . . ."

To the contrary, the evidence showed that, even if the other gang members did not hold Hernandez down, they confined him to his car so that defendant Rivas would have

24

access to him. The distinctive way in which Hernandez was cut is indicative of the "bitch slash" inflicted by gang members on their victims, so the jury reasonably inferred that defendant Rivas, a gang member acting with his gang, meant to inflict that specific, disfiguring injury. That defendant Rivas's expert had only seen that type of attack in prison and not on the streets goes only to the weight of the evidence, and the jury reasonably concluded that the specific injury is what defendant Rivas intended to inflict.

Attempting to characterize the assault as an indiscriminate attack on Hernandez is nothing more than an attempt to construe the evidence in defendant Rivas's favor. While the gang members certainly swarmed the car and stole the beer, the jury reasonably inferred that the infliction of injury on Hernandez was a focused attack to intentionally disfigure him.

The evidence of aggravated mayhem was sufficient to convict defendant Rivas.

V

*Aggravated Assault as Necessarily Included Offense of Aggravated Mayhem*

(Valadez only)

Defendant Valadez contends that he could not be convicted of both aggravated mayhem and aggravated assault (assault with force likely to produce great bodily injury) for the same act because aggravated assault is a lesser included offense of aggravated mayhem. The contention fails because aggravated assault is not a lesser included offense of aggravated mayhem.

"Although the general rule in California is that a single act or course of conduct by a defendant can lead to multiple convictions ([Pen. Code,] § 954; [citation]), 'a judicially created exception to this rule prohibits multiple convictions based on necessarily included offenses. [Citations.]' [Citation.] For purposes of this rule, 'we apply the elements test, asking whether " ' "all the legal ingredients of the corpus delicti of the lesser offense [are] included in the elements of the greater offense." ' " [Citation.] [Citation.] In other words, "if a crime cannot be committed without also necessarily committing a lesser

25

offense, the latter is a lesser included offense within the former." [Citation.]' [Citation.]" (*People v. Quintero* (2006) 135 Cal.App.4th 1152, 1168 (*Quintero*).)

While simple assault is a lesser included offense of aggravated mayhem (*People v. De Angelis* (1979) 97 Cal.App.3d 837, 841), aggravated assault is not (*Quintero, supra,* 135 Cal.App.4th at p. 1168.)

"[Penal Code] section 205 provides that '[a] person is guilty of aggravated mayhem when he or she unlawfully, under circumstances manifesting extreme indifference to the physical or psychological well-being of another person, intentionally causes permanent disability or disfigurement of another human being or deprives a human being of a limb, organ, or member of his or her body. . . .' Assault with a deadly weapon or by means of force likely to produce great bodily injury, by contrast, is proscribed in [Penal Code] section 245, subdivision (a)(1) as follows: 'Any person who commits an assault upon the person of another with a deadly weapon or instrument other than a firearm or by any means of force likely to produce great bodily injury shall be punished by imprisonment in the state prison. . . .' Applying the elements test to these two offenses, the crime of assault with a deadly weapon or by means of force likely to produce great bodily injury is not a lesser included offense of aggravated mayhem because the disfiguring injury or disability may be inflicted without the use of a deadly weapon or by use of force not necessarily likely to cause great bodily injury. [Citation.]" (*Quintero, supra,* 135 Cal.App.4th at p. 1168.)

Since aggravated assault is not a lesser included offense of aggravated mayhem, we need not reverse the conviction for aggravated assault.

## VI

### *Restitution Fines*

### (Valadez only)

Defendant Valadez contends, and the Attorney General agrees, that the restitution fines imposed for two probation revocations must be reversed because fines were already imposed for those convictions. We also agree.

When the trial court sentenced defendant Valadez in this case, it also imposed terms for revocation of probation in two prior cases: case Nos. CRF 09-3023 and CRF 09-5199. The court imposed restitution fines for each of the three cases, including the current case. However, when defendant Valadez was given probation for the other two cases, the court also imposed restitution fines under Penal Code sections 1202.4 and 1202.44, the latter to become effective upon revocation of probation.

A trial court has no statutory authority to order a second restitution fine upon revocation of probation. (*People v. Chambers* (1998) 65 Cal.App.4th 819, 822.) Therefore, we must vacate the restitution fines imposed by the trial court upon revocation of probation.

## VII

### *Effective Assistance of Counsel*

### (Rivas only)

Defendant Rivas contends that his defense attorney at trial violated his Sixth Amendment right to counsel because he (1) elicited testimony that there had been an anonymous tip implicating defendant Rivas, (2) failed to object to and elicited testimony revealing defendant Rivas's prior conviction, and (3) elicited testimony that defendant Rivas had invoked his right to an attorney during questioning. The contention is without merit.

27

A.    *Applicable Law*

To establish ineffective assistance of counsel, a defendant must show (1) counsel's performance was deficient and fell below an objective standard of reasonableness and (2) it is reasonably probable that a more favorable result would have been reached absent the deficient performance.  (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688 [80 L.Ed.2d 674, 693-694].)  A reasonable probability is a "probability sufficient to undermine confidence in the outcome."  (*Id.* at p. 694.)

"In evaluating a defendant's claim of deficient performance by counsel, there is a 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance' [citations], and we accord great deference to counsel's tactical decisions.  [Citation.]  Were it otherwise, appellate courts would be required to engage in the ' "perilous process" ' of second-guessing counsel's trial strategy.  [Citation.]  Accordingly, a reviewing court will reverse a conviction on the ground of inadequate counsel 'only if the record on appeal affirmatively discloses that counsel had no rational tactical purpose for his act or omission.' [Citations.]"  (*People v. Frye* (1998) 18 Cal.4th 894, 979-980, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

B.    *Analysis*

1.    Anonymous Tip

At the time of the assault, defendant Rivas was on probation.  Apparently, in the days following the assault, the detectives investigating this case (Detectives Omar Flores and Ronald Cordova of the Woodland Police Department) did not have reason to suspect that defendant Rivas was involved until an anonymous tip caused the detectives to suspect that defendant Rivas might be one of the men seen in the surveillance video. They called defendant Rivas's probation officer, Mike Ha, and had him come to the police department to view the video and see if he could identify anyone in the video.  The

28

detectives and Probation Officer Ha said in their testimony that the detectives did not tell Probation Officer Ha whom to look for in the video. After watching the video at least 10 times, Probation Officer Ha identified defendant Rivas as one of the men in the video.

In cross-examination of Detective Cordova by counsel for defendant Rivas, the following exchange occurred:

"Q. . . . Isn't it true that on September 24th of 2009 attention had already focused on Jose Rivas?

"A. Are you speaking of the anonymous tip?

"Q. I'm just asking was it his name out there as one of the potential people involved?

"A. I don't know the specific date that a phone call was made and a message was left. It may have been the 24th of September, but there was information that was given to us. At that time it was merely intelligence because we couldn't do anything with it.

"Q. Okay. So his name had come up?

"A. His name had come up.

"Q. On the 24th?

"A. Yes."

Later, the prosecutor asked Detective Flores why the detectives wanted Probation Officer Ha to view the surveillance video. Probation Officer Ha responded that the department had received an anonymous tip. Counsel for defendant Rivas objected, and the objection was sustained.

In his closing argument, counsel for defendant Rivas told the jury that the identification of defendant Rivas as a participant in the assault is problematic. He cautioned the jury that the surveillance video was of poor quality and that Probation Officer Ha's identification of defendant Rivas as appearing in the video was not certain. Probation Officer Ha testified that he was 80 percent sure it was defendant Rivas.

Counsel also observed that Probation Officer Ha's testimony of defendant Rivas's appearance (hair cut and facial hair) around the time of the assault did not match defendant Rivas's appearance in the video. Finally, counsel argued that Probation Officer Ha's testimony about defendant Rivas's tattoos also did not match his appearance in the video.

On appeal, defendant Rivas contends that eliciting the information about the anonymous tip constituted ineffective assistance of counsel because the testimony "plant[ed] in the jurors' minds that there was someone with special knowledge of the circumstances of the assault . . . who was potentially at risk by making a public disclosure of this information, thus giving credence to the accusation." The contention is without merit because counsel may have had rational tactical purpose for eliciting the testimony.

Defendant Rivas's main defense was that he was not present during the assault. Part of this defense was to challenge Probation Officer Ha's identification of defendant Rivas in the surveillance video. Eliciting the testimony about the anonymous tip and the detectives' focus on defendant Rivas when asking Probation Officer Ha to view the video could have been intended to raise a doubt in the jurors' minds about whether the detectives, before showing the video, may have communicated to Probation Officer Ha something that led him to believe he was looking for defendant Rivas, or even just one of his probationers, thus calling into question the reliability of the identification.

In any event, it is not reasonably probable that defendant Rivas would have obtained a more favorable result if Detective Cordova had not testified concerning the anonymous tip. The comment was brief. And not only Probation Officer Ha but also Jennifer Hernandez (a completely disinterested witness) and the victim, Osvaldo Hernandez, identified defendant Rivas.

### 2. Prior Conviction

Probation Officer Ha testified on direct examination by the prosecutor that he supervises a "domestic violence anger management caseload" and that he supervised

defendant Rivas at the time of the assault. On cross-examination, counsel for defendant Rivas questioned Probation Officer Ha about how well defendant Rivas was doing on probation. Probation Officer Ha responded that defendant Rivas was doing well, participating in a batterer's intervention program, as well as testing clean for drugs and alcohol.

On appeal, defendant Rivas asserts that counsel should have objected to testimony about defendant Rivas's prior conviction and should not have elicited testimony that he had been participating in a batterer's intervention program. According to defendant Rivas, this constituted ineffective assistance of counsel. We disagree. Counsel may have had a rational tactical purpose for eliciting the testimony. That defendant Rivas was on probation was relevant and admissible because that led to identification by Probation Officer Ha from the surveillance video. Allowing the jury to learn that the prior conviction was for domestic violence (not gang violence) and defendant Rivas was performing well on probation in the programs relevant to that prior conviction could prevent the jury from speculating about the prior conviction. It also allowed counsel to cast defendant Rivas in the favorable light of turning his life around.

In any event, it is not reasonably probable that defendant Rivas would have obtained a more favorable result if counsel had objected to the evidence concerning the prior conviction and had not elicited information about how defendant was performing in the programs. The prosecutor did not argue that defendant Rivas's prior conviction was evidence of any character-based propensity to commit the crimes in this case. And the evidence of defendant Rivas's participation in the assault was strong.

### 3. Invocation of Right to Attorney

Also during cross-examination of Detective Cordova by counsel for defendant Rivas, the following exchange took place:

"Q. One final question. Did you personally interview Jose Rivas?

"A. Yes.

31

"Q. Okay. Was there anybody else present when you interviewed Jose Rivas?

"A. I don't think so. It was very short.

"Q. Now, you were directing – again, supervising, I understand, but was there a conversation about – between you and Officer Flores concerning following up on the information that was derived from the interview with Jose Rivas?

"A. He invoked for an attorney, so I don't think there was any information that we got from him.

"Q. Isn't it true that Mr. Rivas advised you and Officer Flores that he had been home at the time?

"[Prosecutor]: Objection, your Honor.

"THE COURT: Sustained.

"[Counsel for defendant Rivas]:

"Q. Your Honor, this isn't for the truth. I'm simply trying to find out what procedures were followed and why they were followed in the investigation.

"THE COURT: I'd sustain the objection as to that specific question.

"[Counsel for defendant Rivas]: Isn't it true that Mr. Rivas provided you with information as to his whereabouts at the time of the incident?

"A. I don't recall him doing anything other than invoking his Miranda. I remember it was very short."

Citing *Doyle v. Ohio* (1976) 426 U.S. 610 [49 L.Ed.2d 91] [*Doyle*], which bars use of a defendant's invocation of his right to remain silent as evidence against him, defendant Rivas contends that his attorney's failure to have his invocation of his right to remain silent excluded from evidence constituted ineffective assistance of counsel. The contention is without merit because (1) *Doyle* prohibits prosecutorial use of a defendant's invocation of his right to remain silent, not a defendant's use of the invocation, and (2) there was no prejudice.

"The basis of the [*Doyle*] rule is that 'it is fundamentally unfair, and a deprivation of due process, to promise an arrested person that his silence will not be used against him, and then to breach that promise by using silence to impeach his trial testimony.' [Citation.]" (*People v. Clark* (2011) 52 Cal.4th 856, 959.)

The prosecution did not use defendant's silence as evidence against him. Under these circumstances, there is no violation of *Doyle*. (*People v. Hollinquest* (2010) 190 Cal.App.4th 1534, 1555-1556.) There is no prohibition on the defense eliciting and using evidence that the defendant invoked his right to remain silent.

Defendant Rivas does not state clearly how this testimony was prejudicial to him. He notes that *Doyle* error violates a defendant's right to remain silent because it "turn[s] the invocation of the right into a suggestion of guilt." However, as mentioned, there was no *Doyle* error here, and the prosecution did not argue that defendant Rivas's invocation of his right to remain silent suggested guilt.

In closing argument, the prosecutor said: "[Counsel for defendant Rivas] also criticized the police for never checking out Mr. Rivas' statement to them, but there's no evidence in front of you that Mr. Rivas ever told the police what he did." This was not prosecutorial use of defendant Rivas's invocation of his right to remain silent. Instead, it was merely a comment refuting the assertion made by counsel for defendant Rivas that he had made a statement to police.

Only speculation supports an argument that the jury actually used defendant Rivas's invocation of his right to remain silent as evidence against him. Therefore, it is not reasonably probable that defendant Rivas would have obtained a more favorable result if the evidence had been excluded.

VIII

*Consecutive Sentencing*

(Rivas only)

33

Defendant Rivas contends that the trial court erred by imposing consecutive sentences for the robbery and aggravated mayhem convictions. The contention is without merit because the objective associated with each crime was separate and distinct.

Penal Code section 654, subdivision (a) provides in part: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."

"It has long been held that [Penal Code] section 654 bars multiple punishment for separate offenses arising out of a single occurrence where all of the offenses were incident to one objective. [Citations.]" (*People v. Calderon* (2013) 214 Cal.App.4th 656, 661.) "However, if the defendant harbored 'multiple or simultaneous objectives, independent of and not merely incidental to each other, the defendant may be punished for each violation committed in pursuit of each objective even though the violations share common acts or were parts of an otherwise indivisible course of conduct. [Citation.]' [Citations.]" (*People v. Jones* (2002) 103 Cal.App.4th 1139, 1143.) "Whether [Penal Code] section 654 applies in a given case is a question of fact for the trial court, which is vested with broad latitude in making its determination. [Citations.] Its findings will not be reversed on appeal if there is any substantial evidence to support them. [Citations.]" (*People v. Jones, supra,* at p. 1143.)

Here, the trial court had the proper standard well in mind when it imposed consecutive sentences for robbery and aggravated mayhem. It said: "The jury found that the defendant intended to permanently disfigure Mr. Hernandez when he slashed him. [¶] The specific intent for the robbery is obviously the intent to take the beer, so the intents are different. [¶] The beer was actually taken before the slashing occurred, so I find that consecutive sentencing is, indeed, warranted for the robbery offense."

Defendant Rivas disagrees. He writes: "The assault on Mr. Hernandez was incidental to the singular objective, the robbery of [the] car's occupants."

34

We must accept the trial court's interpretation of the evidence because it is supported by the evidence, as the trial court noted at sentencing. As we have noted throughout this opinion, the evidence was sufficient to support the conclusion that the slashing of Hernandez's face was meant to disfigure him and leave the mark as an advertisement for the Norteño gang. It did not facilitate the robbery, which had already been accomplished, and it was done with a separate intent. Therefore, we reject defendant Rivas's contention.

DISPOSITION

As to defendant Rivas, the judgment is affirmed.

As to defendant Valadez, the restitution fines imposed upon revocation of probation in case Nos. CRF 09-3023 and CRF 09-5199 are vacated. As modified, the judgment as to defendant Valadez is affirmed. The trial court is directed to prepare an amended abstract of judgment and to send it to the Department of Corrections and Rehabilitation.

            NICHOLSON  , J.

We concur:

   RAYE    , P. J.

   ROBIE   , J.

35