Filed 3/20/24  P. v. Bibiano-Lopez CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>EDUARDO BIBIANO-LOPEZ,<br><br>    Defendant and Appellant. | A163978<br><br><br>(Alameda County<br>Super. Ct. No. 20-CR-013931-B) |
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>DAVID MARTIN,<br><br>    Defendant and Appellant. | A164061<br><br><br>(Alameda County<br>Super. Ct. No. 20-CR-013931-A) |

Codefendants Eduardo Bibiano-Lopez and David Martin bring a consolidated appeal from final judgment after being convicted of first degree murder and sentenced to 25 years to life in prison.  Codefendants jointly contend (1) they received ineffective assistance of counsel when defense counsel failed to move to strike expert testimony regarding the victim's cause of death and failed to object to testimony from an investigating officer suggesting Bibiano-Lopez lied during his interview and (2) there is no substantial evidence that they committed the murder.  In addition, defendant Martin contends (1) his due process rights were violated by a trial court order

1

requiring trial participants to wear face coverings to protect against the spread of coronavirus disease 2019 (COVID-19) and (2) the trial court erred by admitting fingerprint comparison evidence because it was scientifically unreliable and more prejudicial than probative.  We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

On March 11, 2021, an information was filed charging codefendants and Armando Sanchez[1] with the murder of Jose Magdaleno Lechuga (victim) (Pen. Code, § 187, subd. (a)).[2]  A joint trial began in June of 2021.

### I.    *Murder Evidence.*

#### A.    **The victim is found bound, bloody and wrapped head to toe in duct tape.**

The victim lived in an apartment in Oakland.  On November 13, 2018, at 7:30 p.m. or 8 p.m., the victim's son, J.L., visited his father at his father's apartment to pick up a heater.  J.L. did not stay long since the victim was getting ready for bed.

The next day, J.L. called the victim around 10 a.m. to ask whether he wanted to get together for a meal, as the pair did most days.  The victim did not answer his phone, despite J.L.'s repeated calling.  Finally, J.L. became worried and went to the victim's apartment.  After knocking repeatedly on the door and driving around the neighborhood looking for the victim,[3] J.L. called a locksmith to unlock the apartment.  The locksmith arrived about 4 p.m.  J.L. used a crowbar to open the outer security door, and the locksmith then picked the lock on the inside door.

---

[1] Sanchez was acquitted and is mentioned only where relevant to this appeal.

[2] Unless otherwise stated, all statutory citations herein are to the Penal Code.

[3] The victim's car was in the apartment complex's parking lot.

When the men entered, they immediately saw the victim's body lying on its back just inside the front door with duct tape wrapped around its legs, chest and head. The locksmith ran away and called 911 while J.L. screamed, " 'Dad, Dad.' " J.L. then retrieved a kitchen knife to cut some of the duct tape off of the victim's face, in a futile effort to enable him to breathe. Yet, the victim was already dead.

Paramedics and police began to arrive. The first responder, a paramedic, found the victim's body wrapped "from the head to the toe" in duct tape. His arms were duct taped to his body, his hands were duct taped together at the wrist, and his legs were duct taped above the knees and at the ankles with the pants pulled down. Also, the body was lying in a pool of blood and bound with rope.

Officers noted the victim's apartment appeared to have been the subject of a "messy search" by multiple people, with cabinets and drawers opened, the mattress overturned, and the toilet tank removed from the back of the toilet. Officers also observed cleaning supplies near the body, an opened package of nylon rope with the receipt still inside and a container of protein powder. They found $1,500 in cash in an envelope in a cabinet, a digital scale, and other items typically used to package and sell drugs in a trashcan.

The victim's neighbors reported hearing noises from the apartment the previous evening that sounded like furniture being moved around. One neighbor reported seeing a dark-colored Honda or Toyota that he did not recognize in the parking lot. This neighbor saw an unknown male who, similar to Bibiano-Lopez, appeared to be Hispanic, muscular and around six feet tall. According to the neighbors, this male entered the car and drove away with a woman who appeared pregnant.

## B. The Police Investigation.

Officer Jose Barocio led the investigation. He suspected narcotics played a role based on the presence in the victim's apartment of a digital scale, plastic wrappers, and $1,500 in cash. Officer Barocio speculated the ransacked state of the apartment was consistent with people looking for money or drugs. Officer Barocio later learned the victim was a police informant in narcotics trafficking cases and was himself a narcotics trafficker.

Officer Barocio obtained surveillance video from the home improvement store identified on the receipt found inside the plastic package that had contained nylon rope. This video showed Bibiano-Lopez and Sanchez purchasing the rope on November 12, 2018, two days before the victim was discovered dead.

An examiner with the Oakland Police Department's crime laboratory developed latent prints taken from various objects in the victim's apartment. Fingerprint expert Rebecca Coutant then examined and compared those latent prints with reference fingerprints taken from each codefendant. Through a process of identification known as ACE-V,[4] Coutant found 12 fingerprints that matched Bibiano-Lopez's reference fingerprints, including seven on the protein powder container and lid, one on duct tape affixed to the victim's body, one on the plastic package that had contained nylon rope, and three on the receipt and booklet found inside the package. Coutant found six fingerprints matching Martin's reference fingerprints, including three on duct tape affixed to the victim's body, one on a bottle of cleaning solution

---

[4] ACE-V is an acronym for analysis, comparison, evaluation, and verification.

4

found on a living room table, and two on the plastic package that had contained the nylon rope.

DNA testing was also conducted on various items found in the victim's apartment. Codefendants were excluded as DNA contributors to DNA taken from a variety of items, including a water bottle, 60-plus pieces of duct tape, and the rope. DNA expert Helena Wong noted, however, that the victim's DNA overwhelmed that of any different individual.

### C.      Bibiano-Lopez is arrested.

On June 18, 2019, Bibiano-Lopez was pulled over in a traffic stop for having no license plates while driving a dark blue Toyota Camry with a young woman as his passenger. After initially cooperating, Bibiano-Lopez fled the traffic stop at a speed of 50 to 60 miles per hour while one of the officers was conducting a file check. The officers did not give chase because it would have violated the department's safety policy.

Bibiano-Lopez was ultimately arrested on July 30, 2019, after the crime laboratory identified him as a possible suspect based on the department's fingerprinting analysis. That same day, Officer Barocio interviewed Bibiano-Lopez. Bibiano-Lopez initially denied knowing the victim but eventually admitted the men were well acquainted, having spent time together at a bar near the victim's apartment as well as at the victim's apartment.

### D.      Martin is arrested.

On October 20, 2020, Officer Barocio arrested Martin based on the crime laboratory's identification of his fingerprint on a piece of duct tape. When officers searched Martin's residence, they found a roll of black duct tape.

## II.  *The Verdicts, Sentences and Appeals.*

On August 10, 2021, the jury found codefendants guilty of first degree murder.  On October 22, 2021, the trial court sentenced codefendants to a prison term of 25 years to life.  Each timely appealed.

## DISCUSSION

Codefendants jointly contend (1) they received ineffective assistance of counsel when the defense failed to move to strike expert testimony relating to the victim's cause of death and failed to object to Officer Barocio's testimony that Bibiano-Lopez lied during his interview and (2) there is no substantial evidence that they committed the murder.  Defendant Martin alone contends (1) his rights to confront witnesses and to a fair trial were violated by the trial court's order requiring trial participants to wear face coverings and (2) the trial court erred by admitting fingerprint comparison evidence without holding a hearing to assess its scientific reliability and because it was significantly more prejudicial than probative.  We address each argument *post*.

## I.  *No Ineffective Assistance of Counsel.*

We turn first to codefendants' claims of ineffective assistance based on defense counsel's failure (1) to move to strike expert testimony relating to the victim's cause of death and (2) to object to officer testimony suggesting Bibiano-Lopez lied.  "To prevail on this claim, defendant must show, among other things, that his 'counsel's performance was deficient, in that it fell below an objective standard of reasonableness under prevailing professional norms.'  [Citation.]  In evaluating his claim, we 'defer[] to counsel's reasonable tactical decisions' and presume that 'counsel acted within the wide range of reasonable professional assistance.'  [Citation.]  Thus, defendant ' "must overcome the presumption that, under the circumstances,

6

the challenged action 'might be considered sound trial strategy.' " '
[Citations.] His burden in this regard 'is difficult to carry' in this case,
because this is a direct appeal and the record does not disclose the reason for
counsel's failure to object. [Citation.] For those reasons, we may reverse
'only if (1) the record affirmatively discloses counsel had no rational tactical
purpose for the challenged act or omission, (2) counsel was asked for a reason
and failed to provide one, or (3) there simply could be no satisfactory
explanation.' " (*People v. Arredondo* (2019) 8 Cal.5th 694, 711.)
Codefendants have not met this high standard. Simply put, their defense
was that someone else killed the victim. As such, there are several rational
explanations for the challenged omissions by counsel.

## A. Failure to Move to Strike Expert Testimony.

Dr. Thomas Rogers, a physician and forensic pathologist, testified
regarding the victim's cause of death based on his review of an autopsy report
and documentation prepared by Dr. Melinik, who was unavailable for trial.
Dr. Rogers was present at the victim's autopsy, but he was involved in
another matter and did not participate.[5] Dr. Rogers nonetheless opined that
the victim died of asphyxia caused by suffocation and strangulation due to
the duct tape that covered his mouth, nose and neck. Dr. Rogers also opined
the victim suffered several nonfatal injuries, including blunt trauma and
bruises and lacerations to the head, neck, arms, hands, and leg. However,
Dr. Rogers acknowledged that he did not know whether the victim was
conscious when duct taped or the order in which the victim received his
injuries.

---

[5] Dr. Rogers acknowledged having no memory of being present for the
autopsy, although his presence was noted in Dr. Melinik's autopsy report.

7

Following Dr. Rogers's testimony, defense counsel advised the trial court that they intended to move to strike Dr. Rogers's testimony. However, counsel made no such motion—which codefendants now label as a violation of their constitutional right to effective legal assistance. They reason that Dr. Rogers's testimony violated California law by relating case-specific hearsay from Dr. Melinik's autopsy report to support his opinion about the victim's cause of death. (See *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*).) This argument fails.

Hearsay is "evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." (Evid. Code, § 1200, subd. (a).) Hearsay evidence is generally inadmissible unless it satisfies a statutory exception. (*Id.*, § 1200, subd. (b).)

"Documents like letters, reports, and memoranda are often hearsay because they are prepared by a person outside the courtroom and are usually offered to prove the truth of the information they contain." (*Sanchez, supra*, 63 Cal.4th at p. 674.) Thus, because Dr. Rogers did not perform the victim's autopsy, under *Sanchez*, he could not relate to the jury any observations recorded in Dr. Melinik's report if they were offered to prove their truth. (*Ibid*.) While experts such as Dr. Rogers may rely on hearsay to form their own independent opinions, they may not " 'relate as true case-specific facts asserted in hearsay statements, unless they are independently proven by competent evidence or are covered by a hearsay exception.' (*Sanchez*, at p. 686.)" (*People v. Turner* (2020) 10 Cal.5th 786, 821.)[6]

_____

[6] As the California Supreme Court recently explained: "Some prior cases had allowed experts to relate case-specific facts on the theory that the material was not offered for its truth, but merely to show the basis of the expert's opinion. *Sanchez* pointed out the flaw in this logic: 'When an expert

8

According to codefendants, when Dr. Rogers related facts to the jury as true regarding the cause of the victim's death—to wit, suffocation and strangulation caused by duct tape wrapped around his head and neck—he related case-specific hearsay from the otherwise inadmissible autopsy report, which violated *Sanchez*.

However, even if we were to agree with this argument, error in the admission of hearsay requires reversal of the judgment only if " 'it is reasonably probable that a result more favorable to the [defendant] would have been reached in the absence of the error.' " (*People v. Watson* (1956) 46 Cal.2d 818, 837; *People v. Turner, supra*, 10 Cal.5th at p. 823.) Here, it is not reasonably probable that allowing Dr. Rogers to introduce case-specific hearsay from the autopsy report regarding the cause of the victim's death affected the jury verdicts because there was no question the victim was murdered; the question was who murdered him. (*People v. Turner, supra*, 10 Cal.5th at p. 821; *Chapman v. California* (1967) 386 U.S. 18, 24.) Defense counsel could thus have reasonably decided against moving to strike Dr. Rogers's testimony to avoid prompting the prosecution to offer additional evidence relating to the harm suffered by the victim as a result of being duct taped—evidence that would have been gruesome, emotionally charged, and, yet, not necessary to prove codefendants' theory that they were not involved in the victim's death.

_____

relies on hearsay to provide case-specific facts, considers the statements as true, and relates them to the jury as a reliable basis for the expert's opinion, it cannot logically be asserted that the hearsay content is not offered for its truth. In such a case, "the validity of [the expert's] opinion ultimately turn[s] on the truth" [citation] of the hearsay statement. If the hearsay that the expert relies on and treats as true is not true, an important basis for the opinion is lacking.' (*Sanchez*, at pp. 682–683, italics omitted.)" (*People v. Turner, supra*, 10 Cal.5th at p. 821.)

Indeed, when the victim's body was discovered on November 14, 2018, the fact that it had been badly beaten before being wrapped "head to toe" in duct tape was established by a wealth of other evidence—including the firsthand observations of first responders and other witnesses who testified at trial. (*People v. Brooks* (2017) 3 Cal.5th 1, 58 [we presume the existence of every fact in support of the verdict that could reasonably be inferred from the evidence].) It was also undisputed the victim, a known drug trafficker, was alive the previous evening when his son visited him. When J.L. found the victim's still warm body the next day, the first thing he did was get a knife and cut the duct tape from the victim's mouth, in a futile effort to help him breathe. Under these circumstances, we defer to counsel's tactical choice not to dispute the fact that the victim died as a result of intentional murder by challenging Dr. Rogers's testimony. (*People v. Arredondo, supra*, 8 Cal.5th at p. 711.) Accordingly, codefendants' challenge to counsel's failure to move to strike this testimony fails.

## B. Failure to Object to Lay Opinion.

Codefendants next contend defense counsel provided ineffective assistance by failing to object to Officer Barocio's response when asked during cross-examination whether Bibiano-Lopez was uncooperative during his interview. Specifically, Barocio answered that Bibiano-Lopez was "uncooperative" because he failed to "disclose the truth, in my opinion." As codefendants note, "a witness cannot express an opinion concerning the guilt or innocence of the defendant." (*People v. Torres* (1995) 33 Cal.App.4th 37, 47.) As before, their claim nonetheless fails because they cannot overcome the legal presumption that defense counsel had a rational tactical purpose for not objecting to Barocio's testimony. (*People v. Arredondo, supra*, 8 Cal.5th at p. 711.)

Initially, codefendants misconstrue the record in arguing there could be no reasonable tactical basis for allowing Officer Barocio to opine that Bibiano-Lopez was guilty. Officer Barocio stated that Bibiano-Lopez failed to disclose the truth—which was accurate. In his police interview, Bibiano-Lopez initially denied knowing the victim before he ultimately acknowledged having spent time with him at his apartment after meeting him at a local bar. Defense counsel could have reasonably concluded there was no point in objecting to witness testimony that was objectively true.

Moreover, the record reflects that, in fact, defense counsel used Officer Barocio's response to codefendants' advantage. On cross-examination, defense counsel pressed Officer Barocio on this point: "So you had made up your mind that my client did it and you were going to get him or try to get him to confess; am I correct?" Barocio countered, "No, I just wanted the truth, sir." Further, in closing arguments, defense counsel repeatedly accused Officer Barocio of assuming Bibiano-Lopez was guilty before completing his investigation. Thus, defense counsel used the challenged testimony to paint Officer Barocio as inept and biased in the eyes of the jury—a strategy that may have worked to Bibiano-Lopez's advantage but for the other evidence of guilt. Accordingly, codefendants' second challenge to defense counsel's representation also fails.[7]

---

[7] In a related petition for writ of habeas corpus (case No. A168148), Bibiano-Lopez raises identical claims of ineffective assistance of counsel based on his attorney's failure to move to strike Dr. Rogers's testimony and to object to Officer Barocio's testimony suggesting that he lied. For the same reasons set forth herein, we deny Bibiano-Lopez's petition by separate order filed contemporaneously with this opinion.

## II.    *Substantial Evidence Supported the Jury Verdicts.*

Codefendants next argue the evidence was insufficient to support the jury's verdicts because the mere fact that their fingerprints were found at the victim's apartment did not prove they were present at the victim's apartment when he was murdered.  Not so.

"In evaluating a claim regarding the sufficiency of the evidence, we review the record 'in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.] . . . 'The standard of review is the same in cases in which the prosecution relies mainly on circumstantial evidence.' [Citations.]  'We presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence.' " (*People v. Westerfield* (2019) 6 Cal.5th 632, 713.)

Here, the evidence sufficed to prove codefendants were guilty of first degree murder.  The jury heard from multiple eyewitnesses that the victim's body was discovered bound, beaten, bloody and wrapped from head to toe in duct tape.  His apartment had been ransacked.  In addition to finding items commonly associated with drug trafficking, the police found an opened package of rope with a receipt dated November 12, 2018, still inside.  The rope was found wrapped around the victim's body.  The police used the receipt to trace the rope to a home improvement store where they discovered surveillance video showing Bibiano-Lopez and Sanchez purchasing it just a day or so before the murder.

The police also conducted a fingerprint analysis using the suspects' known prints to match them to latent prints found on various items in the victim's apartment.  Bibiano-Lopez's prints, 12 in total, were found on the

duct tape affixed to the victim's body, the plastic package that had contained the rope, the receipt found inside this package, and a container of protein powder. Martin's fingerprints (three) were also found on the duct tape affixed to the victim's body. The fact that these fingerprints were made contemporaneously with the victim's murder was established by the surveillance video of Bibiano-Lopez and Sanchez purchasing the rope on November 12, 2018, just before the murder.

Additionally, the victim's neighbors observed a muscular Hispanic man, about six feet tall, who matched Bibiano-Lopez's description, in the parking lot of their apartment complex around the time of the victim's murder. A neighbor observed this man enter what appeared to be a dark blue or gray Toyota when leaving the parking lot. A few months after the murder, Bibiano-Lopez and a passenger were pulled over in a traffic stop in a blue Toyota matching this description. Finally, after initially cooperating with the police officers during the traffic stop, Bibiano-Lopez fled at a high rate of speed, suggesting his guilt.

From this collection of evidence, the jury could have reasonably inferred codefendants were guilty of first degree murder. (*People v. Westerfield, supra*, 6 Cal.5th at p. 713.) Nothing more was required to affirm their convictions.[8]

---

[8] As codefendants note, the fingerprint experts testified that they could not tell the age of a print and that fingerprints can be transferred or remain on a surface for years if left undisturbed indoors in a temperate environment. However, when, as here, the circumstances reasonably justify the jury's findings, reversal is not warranted " 'simply because the circumstances might also reasonably be reconciled with a contrary finding.' " (*People v. Westerfield, supra*, 6 Cal.5th at p. 713.)

**III.** *No Violation of Martin's Constitutional Rights to Confrontation and a Fair Trial.*

Codefendant Martin contends his constitutional rights to confrontation and a fair trial were violated by a trial court order requiring him, his attorney, jurors, and witnesses to wear face coverings during trial to protect against COVID-19. This right was further violated, Martin contends, when the court rearranged the courtroom for social distancing purposes by placing prospective jurors behind him and his attorney during jury selection. According to Martin, the court's order interfered with (1) his evaluation of prospective jurors during jury selection, (2) his evaluation of the jurors' conduct during trial, (3) his and the jurors' evaluation of witnesses, and (4) his ability to communicate effectively with counsel. When, as here, the relevant facts are undisputed, we review a defendant's claim under the confrontation clause de novo. (*People v. Coulthard* (2023) 90 Cal.App.5th 743, 773.)

The People respond that Martin forfeited his challenge to the court's order as it relates to prospective jurors during jury selection, and to himself, his attorney[9] and the jury during trial, by failing to raise an objection below. As to the witnesses, the People dispute that the order violated Martin's right of confrontation or a fair trial. We agree with both contentions.

"As a general rule, a defendant's failure to object to an alleged trial error relieves an appellate court of the obligation to consider the claim on review. [Citation.] The reason for this rule is to allow the trial court to correct its errors and 'to prevent gamesmanship by the defense.' [Citation.] We have applied this rule numerous times to find forfeiture of a

---

[9] The court permitted counsel not to use a face covering during closing argument so long as counsel stood behind a podium behind an acrylic enclosure.

14

constitutional right of confrontation claim. [Citations.]" (*People v. Arredondo, supra*, 8 Cal.5th at p. 710.)

The People correctly note that defendant never objected to the trial court's COVID-19 order as it applied to prospective jurors, jurors, defendant and defendant's attorney. Had he done so, " 'the trial court would have had an opportunity to correct [any] error [in requiring masks or socially distanced seating], or to make additional findings on the record regarding the necessity of [these requirements] as to' " these individuals. In the absence of any objection, defendant has forfeited his claim. (*People v. Arredondo, supra*, 8 Cal.5th at p. 710, 2d & 3d bracketed insertions added.)

Further, as to the order requiring testifying witnesses to wear face coverings, we find no violation of defendant's right to confront witnesses or to a fair trial. In making this order at a pretrial hearing on July 19, 2021, the trial court explained to counsel that the presiding judge recently issued an order requiring "all persons in court facilities to . . . wear allowable face coverings . . . regardless of vaccination status." The court acknowledged face coverings could "inhibit the accused's right to confront and cross-examine." Accordingly, the court ruled that testifying witnesses would not wear face masks but a clear face shield with "a drape" so "the jury can see their face." The victim's son, J.L., was permitted to wear a face mask after he refused on safety grounds to wear the face shield and drape. These orders were sound.

"The confrontation clauses of the state and federal Constitutions guarantee defendants the right to confront the witnesses against them. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15.) 'The right of confrontation "seeks 'to ensure that the defendant is able to conduct a "personal examination and cross-examination of the witness." ' " ' [Citation.] Via the confrontation right, a defendant is able to compel prosecution witnesses to

15

appear before the jury so their credibility may be assessed." (*People v. Wilson* (2021) 11 Cal.5th 259, 289–290.)

However, while "the constitutional right of confrontation is important, it is not absolute." (*People v. Wilson, supra*, 11 Cal.5th at p. 290.) "[W]hile 'face-to-face confrontation forms "the core of the values furthered by the Confrontation Clause," [citation] . . . , it is not the *sine qua non* of the confrontation right.' [Citations.] Rather, ' "the Confrontation Clause reflects a *preference* for face-to-face confrontation at trial," [citation], a preference that "must occasionally give way to considerations of public policy and the necessities of a case." ' [Citations.] The face-to-face requirement can be dispensed with, but 'only where denial of such confrontation is necessary to further an important public policy and only where the reliability of the testimony is otherwise assured.' [Citations.] This public policy exception is not a general one; it must be applied on a case-by-case basis." (*People v. Alvarez* (2022) 75 Cal.App.5th 28, 35.)

Our state courts have routinely recognized a defendant's right to confrontation may be forced to yield to the important public interest in protecting trial participants from risks associated with the spread of COVID-19, a contagious and potentially deadly disease. (E.g., *People v. Molina* (2023) 96 Cal.App.5th 516, 520–521 ["California courts have repeatedly rejected constitutional challenges to the use of masks during the COVID-19 pandemic for both defendants and testifying witnesses, citing the important state interest in protecting the public from a contagious disease, the lack of effective alternatives to masking, and the relatively minimal limitation that masks have on jurors' ability to assess witness credibility"]; *People v. Edwards* (2022) 76 Cal.App.5th 523, 525 ["The Constitution does not require judges to imperil public health"]; *People v. Coulthard, supra*, 90

Cal.App.5th at pp. 774–775 [defendant's constitutional right to confront witnesses was not violated when the trial court allowed witness to testify remotely to protect against spread of COVID-19]; *People v. Kocontes* (2022) 86 Cal.App.5th 787, 880 ["The unprecedented global health crisis required the trial court to balance Kocontes's constitutional rights, the jurors' health, and preserving judicial resources. . . . The record reflects the court remained appropriately focused on these compelling interests"].)

We find particularly apt a recent decision from our colleagues in the Second Appellate District. In *People v. Alvarez, supra*, 75 Cal.App.5th at page 37, our colleagues addressed and soundly rejected an argument quite similar to Martin's argument: "The 'ultimate goal' of the confrontation clause, ensuring the reliability of evidence (*Crawford v. Washington* [(2004)] 541 U.S. [36,] 61), 'is a procedural rather than a substantive guarantee. It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by [subjecting it to] the crucible of cross-examination' and other procedural safeguards. (*Ibid.*) Those procedural safeguards are: (1) in-person testimony; (2) given under oath; (3) subjected to cross-examination and (4) the ability of the defendant and fact finder to view witness demeanor for the purpose of evaluating credibility. ([*Maryland v.*] *Craig* [(1990)] 497 U.S. [836,] 845–846 [111 L.Ed.2d 666].) The 'combined effect' of these elements of confrontation 'ensur[es] that evidence admitted against an accused is reliable and subject to the rigorous adversarial testing that is the norm of Anglo-American criminal proceedings.' (*Ibid.*)"

"Here, all four safeguards inherent in confrontation were present. Witnesses testified in the solemnity of the courtroom and in the presence of defendant, under oath, and subject to rigorous cross-examination, ' " 'the greatest legal engine ever invented for the discovery of truth.' " ' (*Craig,*

17

*supra*, 497 U.S. at p. 846.)  Although face masks covered the witnesses' mouths and the lower part of their noses, significant aspects of their appearance, including the eyes, tops of the cheeks, and the body, were readily observable as was [*sic*] posture, tone of voice, cadence and numerous other aspects of demeanor:  'Demeanor includes the language of the entire body [and] jurors will be able to observe most facets of the witnesses' demeanor. They can observe the witnesses from head to toe.  They will be able to see how the witnesses move when they answer a question; how the witnesses hesitate; how fast the witnesses speak.  They will be able to see the witnesses blink or roll their eyes, make furtive glances, and tilt their heads.  The Confrontation Clause does not guarantee the right to see the witness's lips move or nose sniff, any more than it requires the jurors to subject the back of a witness's neck to a magnifying glass to see if the hair raised during particularly probative questioning.'  [Citation.]"  (*People v. Alvarez, supra*, 75 Cal.App.5th at p. 38.)

We agree wholly with this reasoning and apply it here.  Accordingly, we reject defendant Martin's constitutional challenge to the trial court's order adopting reasonable and necessary COVID-19 safety protocols, including face coverings and social distancing, for the protection of all trial participants.[10]

---

[10] In challenging the court's COVID-19 order, defendant also complains there were impediments to the jury's ability to hear his attorney and the witnesses due to "issues with the microphones being either turned off, broken, or otherwise challenging to use."  However, his argument fails to include a reasoned analysis supported by citations to the record and the applicable law, or any showing of prejudice.  Accordingly, we decline to address it.  (*Citizens for Open Government v. City of Lodi* (2012) 205 Cal.App.4th 296, 311 ["An appellant's burden to prove prejudicial error is well established.  Indeed, it is part of our state's Constitution.  Because [appellant] has failed to carry that burden, it is not entitled to reversal on appeal"].)

## IV.   *The Fingerprint Evidence Was Properly Admitted.*

Defendant Martin's final challenge is to the admission of expert testimony regarding the presence of codefendants' fingerprints at the murder scene.  We begin with the relevant facts.

Fingerprinting expert Coutant relied on an identification process known as ACE-V to determine whether any of the latent fingerprints taken from the victim's apartment matched reference prints taken from known individuals that included codefendants.  This process involved placing the latent prints and reference prints side by side and closely comparing them to identify "consistencies and inconsistencies within the patterns . . . ."  Using this process, Coutant found several of codefendants' prints on items found in the victim's apartment, including the duct tape affixed to his body.

On cross-examination, defense counsel attacked both Coutant's method and her conclusions.  She conceded there was no "generally accepted confidence" for fingerprint identifications; nor was there a set number of similarities between a latent print and a known print required to declare a match.  Further, she relied on the crime lab examiner to take proper steps to avoid altering the latent prints.  Coutant did not subscribe to the "one discrepancy rule" followed by some experts wherein the possibility of a match is eliminated if any single difference between the latent and reference prints is identified.  Nor was a "blind verification" performed by a second examiner once Coutant matched the latent prints with codefendants' reference prints.  Finally, she acknowledged her laboratory was understaffed, which sometimes led them to rush identifications.

On appeal, defendant claims the trial court erred by permitting Coutant to present the results of the ACE-V fingerprint identification process without first holding a hearing under *People v. Kelly* (1976) 17 Cal.3d 24

(*Kelly*) to assess its scientific reliability.  In doing so, defendant relies primarily on a 2009 report by the National Research Council of the National Academy of Sciences, which, according to defendant, "found that nuclear DNA analysis was the only forensic method that had been rigorously shown to have the capacity to consistently, and with a high degree of certainty, identify an individual."  He also references a federal case referred to simply as " 'Mayfield' " where a man was misidentified based on a fingerprint comparison made using the ACE-V method.  Alternatively, he contends admission of this evidence was an abuse of discretion under Evidence Code section 352 because the evidence was substantially more prejudicial than probative.  Both contentions fail.

"Under the *Kelly* test, when expert testimony relies on ' "a new scientific technique," ' the proponent must establish 'that the technique is " 'sufficiently established to have gained general acceptance in the particular field to which it belongs' " (quoting *Frye* [*v. U.S.* (D.C. Cir. 1923)] 293 F. [1013,] 1014, italics omitted).' ([Citation]; see *Kelly, supra*, 17 Cal.3d at p. 30.)  Reliability need not be relitigated in every case.  '[O]nce a trial court has admitted evidence based upon a new scientific technique, and that decision is affirmed on appeal by a published appellate decision, the precedent so established may control subsequent trials, at least until new evidence is presented reflecting a change in the attitude of the scientific community.' (*Kelly*, at p. 32.)" (*People v. Turner, supra*, 10 Cal.5th at p. 801.)

The logic of *Kelly* is that "[j]ust as jurors may be unduly persuaded by the ' "misleading aura of certainty which often envelops a new scientific process" ' [citation], so too might they be unduly persuaded by familiar methods of proof that have fallen into disrepute in the relevant scientific community.  Indeed, familiar methods of proof may pose a risk of deception

20

precisely because they are familiar." (*People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 831–832.)

Coutant's fingerprint comparison opinions fall outside the scope of *Kelly* because her methodology (ACE-V) is far from new and is widely accepted by both the scientific community and our appellate courts, including the California Supreme Court. (*People v. Daveggio and Michaud, supra*, 4 Cal.5th at p. 832 [defendants' reliance "primarily on a newspaper article reporting on the ruling of a single federal district court" is "manifestly insufficient to warrant reconsideration of a form of evidence [to wit, fingerprint comparison evidence] that has for many years been universally accepted"]; *In re O.D.* (2013) 221 Cal.App.4th 1001, 1007, 1008 ["the *Kelly* rule is inapplicable to the ACE-V method of fingerprint comparison because, regardless whether it is generally accepted, fingerprint comparison is not the type of scientific technique *Kelly* governs since it can easily be understood by nonexperts and is unlikely to convey a misleading aura of certainty"]; *People v. Rivas* (2015) 238 Cal.App.4th 967, 975–976 [following *In re O.D.* in holding that fingerprint evidence based on the ACE-V methodology is "not subject to a foundational hearing under [*Kelly*] because fingerprint evidence is not a novel scientific technique and does not have a misleading aura of certainty"].) Neither one federal case nor the 2009 report referenced by defendant—which predates *People v. Daveggio and Michaud, supra*, 4 Cal.5th 790, by nearly a decade—persuades us otherwise. The trial court did not err in refusing defendant's request for a *Kelly* hearing before permitting Coutant to testify.

Further, admission of Coutant's testimony was not an abuse of discretion under Evidence Code section 352. In reviewing defendant's claim under this provision, we apply the abuse of discretion standard. Accordingly, the court's ruling will not be disturbed unless the court exercised its

discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice. (*People v. Chhoun* (2021) 11 Cal.5th 1, 26.) Here, this standard is not met.

To begin with, it is beyond dispute the fingerprint comparison evidence was highly probative of codefendants' guilt, as it tied them to the murder scene and, in particular, to the victim's dead body. And, as with any highly probative evidence of guilt, the fingerprint comparison evidence was naturally prejudicial to codefendants. However, this is not the type of prejudice against which Evidence Code section 352 protects. Rather, Evidence Code section 352 protects against undue prejudice, meaning that which " 'uniquely tends to evoke an emotional bias against a party as an individual . . . .' " (*People v. Robinson* (2005) 37 Cal.4th 592, 632.) Fingerprint comparison evidence is not by its nature emotionally charged.

Finally, to the extent defendant claims it was the unreliability of this evidence that rendered it unduly prejudicial, he had ample opportunity, which defense counsel took advantage of, to make this point to the jury. Among other things, Coutant acknowledged on cross-examination: (1) there was no "generally accepted confidence" for fingerprint identifications, (2) she did not apply the "one discrepancy rule" whereby any single difference between the prints would have eliminated the possibility of a match, (3) her analysis was not verified by a second examiner, and (4) her laboratory was rushed and understaffed. And, as in any case involving fingerprint evidence, defendant, of course, had the right to call his own witness to show the jury where the latent and known fingerprints did not match. (*People v. Rivas, supra*, 238 Cal.App.4th at pp. 978, 981 ["defendant . . . could attempt to impeach [the fingerprint expert] by questioning her about her qualifications and the comparison of these prints or by introducing testimony of a defense

22

expert, but [her] testimony was nonetheless admissible"]; *People v. Venegas* (1998) 18 Cal.4th 47, 80 ["In most . . . instances, the jurors are permitted to rely on their own common sense and good judgment in evaluating the weight of the evidence presented to them"].)

Under these circumstances, the court's admission of the fingerprint comparison evidence was not an abuse of discretion.

## DISPOSITION

The judgment as to each codefendant is affirmed.

Jackson, P. J.

WE CONCUR:

Simons, J.
Burns, J.

A163978/*People v. Eduardo Bibiano-Lopez*
A164061/*People v. David Martin*